SO ORDERED.

SIGNED this 07 day of May, 2010.

_____
J. Rich Leonard
United States Bankruptcy Judge

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WILSON DIVISION

IN RE:

EAGLE CREEK SUBDIVISION, LLC,                    CASE NO.  08-04292-8-JRL

      DEBTOR.

WACCAMAW BANK,

      PLAINTIFF,

      v.                                                    ADVERSARY PROCEEDING
                                                       NO.  L-09-00049-8-JRL

KEYSTONE BUILDERS RESOURCE
GROUP, INC.,

      DEFENDANT.

## ORDER

This case is before the court on the motion of Keystone Builders Resource Group, Inc.

for summary judgment and on Waccamaw Bank's motion for partial summary judgment.  On

March 24, 2010, the court conducted a hearing on these matters in Raleigh, North Carolina.

## JURISDICTION AND PROCEDURE

This court has jurisdiction over the parties and the subject matter of this proceeding

pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the

United States District Court for the Eastern District of North Carolina on August 3, 1984.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), which this court may hear and determine.

### UNDISPUTED FACTS

1.   This adversary proceeding involves a project for the construction of a residential development known as the Eagle Creek Subdivision ("the subdivision").

2.   On November 27, 2006, Keystone Resource Builders Group, Inc. ("Keystone") entered into two contracts to purchase real property to be developed in the subdivision from LandCraft Management, LLC ("LandCraft").  One contract was for the purchase of 50, 60-foot-wide lots ("the 60-foot contract") and the other for 71, 70-foot-wide lots ("the 70-foot contract") (collectively "the contracts").  Keystone was to purchase a total of 121 lots between the two contracts.  The contracts define Keystone as the "Purchaser" and LandCraft as the "Seller."

3.   In accordance with the contracts, Keystone delivered $185,625.00 in earnest money on the 60-foot contract and $327,495.00 on the 70-foot contract.

4.   The bilateral contracts expressly condition each party's performance upon the performance of the other.  (Paragraph 32 Contingent Responsibilities).

5.   Both contracts define the terms "Contract Lots" and "Lots" to be the entire number of lots to be purchased under that contract.  (Preamble to Statement of Purchase).

6.   Paragraph 3, Takedown Schedule and Closings of the contracts provides:

> Within ten (10) days of completion of the following events: (a) street paving, and (b) plat map recording, Purchaser agrees to purchase six (6) lots.  Purchaser agrees to purchase a minimum of six (6) additional lots within ninety (90) days of the initial takedown and an additional six (6) lots each ninety (90) day period

thereafter.  Seller represents that it will demonstrate good faith efforts to record the Lots by September 30, 2008.  If Seller has not recorded the Contract Lots by December 30, 2008, Purchaser may provide notice to Seller of its intent to terminate the Contract and the Earnest Money . . . shall be refunded to Purchaser.

7.    The contracts contain mutual default provisions.  Paragraph 15, <u>Default by Seller</u>, grants Seller 30 days to cure any breach after receipt of written notice from Keystone.  In addition, paragraph 15 provides that "if Seller fails to perform any of its covenants of this Contract, at the option of Purchaser, the Seller shall return the Earnest Money to Purchaser . . . ."  Paragraph 14, <u>Default by Purchaser</u>, provides that if Keystone does not cure any default within 30 days of receiving written notice, Seller is entitled to all remedies available at law or in equity.

8.    LandCraft assigned the contracts to Eagle Creek Subdivision, LLC ("Eagle Creek" or "the debtor").  Eagle Creek was managed by LandCraft, and Scott Stover ("Stover") oversaw both companies.

9.    Eagle Creek borrowed $14,100,000.00 from Waccamaw Bank ("Waccamaw") under a construction loan agreement to develop lots in the subdivision.

10.    As security for the loan, Eagle Creek executed and delivered to Waccamaw a collateral assignment and security agreement ("the collateral assignment"), which pledged as collateral all of Eagle Creek's contracts and permits related to the subdivision.

11.    In the event of default, the collateral assignment directs all parties to assigned contracts to recognize and accept performance from Waccamaw as assignee. (Paragraph 7 <u>Irrevocable Direction</u>).

12.    Paragraph 10, <u>Lender Not Obligated</u>, of the collateral assignment provides:

3

> Nothing contained herein or elsewhere shall operate to obligate, or be construed to obligate, lender to perform any of the terms, covenants or conditions contained in the Assigned Contracts and Permits or otherwise to impose any obligation upon Lender with respect to the Assigned Contracts and Permits or other collateral prior to written notice by Lender to Assignor and to the applicable contracting party of Lender's election to assume Assignor's obligations under one or more of the Assigned Contracts . . . .  At all times Assignor retains the obligation to reimburse Lender promptly upon demand or otherwise to pay when due all obligations and liabilities incurred by Lender in connection with the Assigned Contracts . . . .

13.    Eagle Creek defaulted on the construction loan, which caused Waccamaw to accelerate the balance due and demand that Eagle Creek pay the note in full.

14.    On June 27, 2008, Eagle Creek filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

15.    In July, Stover and J. Daniel Hardy ("Hardy"), Senior Vice President of Waccamaw, exchanged a series of emails concerning the possibility of extending the contractual  recording deadline.  Stover informed Hardy that he had asked "if [Keystone] would entertain pushing back their lot delivery date one year."  Stover wrote:

> In order to remain in compliance with their current contract, we would need to make this decision fairly quickly so as to not jeopardize the current delivery date (should they decide not to extend).  If you are in agreement with this, please reply . . . . We will then execute an amendment to their purchase contract accordingly.

(Deposition Ex. 10, July 5, 2008 (parenthetical in original)).  Stover again emailed Hardy about the extension and said "I'd be quite disappointed to lose our window to complete their lots within the current contract and them [sic] have them walk." (Id. July 12, 2008).

16.    Later that month, Hardy asked Stover about the status of the negotiations with

4

Keystone.  Stover replied:

> Keystone just left me a voice mail that they don't want to make a decision on extending for one year until they see "an outcome" with Eastwood Homes. Given this, it would be our suggestion to build the required Keystone lots and tender them for closing late this year.  (Deposition Ex. 11, July 22, 2008).[1]

17.   Hardy communicated directly with Doug Jones of Keystone by email on August

22, 2008.  Jones had received a copy of the recording plat for Phase I, and he

asked Hardy if he was correct that only 61 lots were being recorded in Phase I.

Hardy replied:

> That is my understanding.  Balance of phase 1 could be completed fairly quickly if we sell first area out.  Are you committed to taking those???  If so, we can move pretty quickly!

Jones responded:

> Where is the second phase? Just the 50 foot lots on the other side of the wetlands continuing along Eagle Creek Drive, or all of the remaining Eastwood lots?

Hardy did not reply.  (Deposition Ex. 14).

18.   Waccamaw's counsel wrote to Keystone's counsel on September 22, 2008, and informed

Keystone's counsel that the success of the debtor's case was dependent on Keystone's

willingness to perform under the contracts and that Waccamaw was lending significant

funds with the goal of meeting the takedown schedule.  The letter states:

> Of course, this assumes that the debtor is able to comply with its contractual obligations to deliver in accordance with those contracts. . . .  If, regardless of whether the debtor meets its obligations under the contracts and delivers the lots in a timely fashion, your client does not intend to meet its contractual obligations, then it would be helpful for us to know that now.  With that in mind, please advise me of your client's intentions.

---

[1] Eastwood Homes was a separate developer in the Eagle Creek Subdivision.

5

(Deposition Ex. 16).

19.    Keystone's counsel responded on September 24, 2008:

> As I have mentioned before, Keystone is skeptical that LandCraft and the Debtor
> will be able to live up to their contractual obligations or successfully reorganize.
> . . . Keystone intends to meet any enforceable legal and contractual obligations.
> It appears, however, that further investigation may prove that any obligations are
> void or voidable due to fraud by one or more of the parties to this bankruptcy.

(Deposition Ex. 17).

20.    Waccamaw and Eagle Creek entered into a settlement agreement, whereby Eagle Creek

agreed to assume the 60-foot and 70-foot contracts and Waccamaw agreed to fund the

remaining costs of the debtor's performance obligations.  The court approved Eagle

Creek's motion to assume the contracts on November 24, 2008.  Keystone was permitted

to retain all of its rights, remedies and defenses as set forth in the contracts.

21.    Derek Ezzell, Waccamaw's account officer for the Eagle Creek loan, emailed Hardy on

December 30, 2008, the lot recording deadline.  He informed Hardy that the plat was

being recorded that day and further advised:

> [T]here is a default by Seller clause in the contract that gives the seller 30 days
> to cure any breach under this contract after having received written notice from
> Purchaser. If Keystone Builders sends written notice of a breach, it would appear
> that we have 30 days to cure any breach once we receive notice.  However, to my
> knowledge we have not received such notice of any kind at this point.

(Deposition Ex. 21).

22.    On December 30, 2008, Seller recorded a plat with 61 lots, comprised of a mixture of 60-

foot and 70-foot lots.  Seller did not record the full amount of lots to be purchased under

either contract.

23.    Keystone received a copy of the recorded plat and a request to schedule a walk through

of the 12 lots to be purchased under the initial takedown schedule.  (Deposition Ex. 23).

24.    By letter ("the December 31st letter") dated December 31, 2008, Keystone informed

Seller that the recordation did not comply with the contract terms in several way,

including the failure to record all of the Contract Lots.  Keystone asked Seller to consider

the letter its "notice of intent to terminate both Contracts" and request for refund of the

earnest money under paragraph 3 of the contracts.  (Deposition Ex. 24).

25.    On January 7, 2009, Keystone filed with the Bankruptcy Court its Notice of Intent to

Terminate Assumed Contracts ("the January 7th notice"), which incorporated the

December 31st letter.

26.    In early January, Eagle Creek defaulted under the settlement agreement, which caused

the automatic stay to lift, permitted Waccamaw to exercise its rights to assume the 60-

foot and 70-foot contracts, and rendered Waccamaw "Seller" under the contracts.

27.    Waccamaw replied to Keystone's letter on January 13, 2009, and asserted that Keystone

was contractually obligated to begin taking down lots according to the takedown

schedule in paragraph 3.  The letter further states:

> We do not believe that the Contract language requires all 121 lots to be recorded
> before the closing of the first twelve lots.  Eagle Creek has recorded all lots in
> Phase 1, which is more than sufficient for the initial take-down, especially in
> light of your client's representations and conduct indicating that it does not
> intend to purchase any of the lots, much less all 121. . . .  Eagle Creek has
> satisfied all conditions precedent to Keystone's obligation to purchase the initial
> 12 lots required by the Contracts. . . .  This letter serves as notice of Keystone's
> default, and Keystone has thirty days from the date of this letter to cure its
> default by closing on six lots under the 60 ft. Lots Contract and six lots under the
> 70 ft. Lots Contract.

(Deposition Ex. 26).

28.    To date, Seller has not recorded any additional lots, nor has Keystone purchased any lots

under the contracts.

29.     The contracts are unmodified by any agreement.

30.     Keystone had purchased lots from LandCraft under prior contracts.  Out of the five

contracts that pre-date the 60-foot and 70-foot contracts Keystone extended the recording

deadline under three contracts, terminated one due to LandCraft's failure to comply with

the lot recording deadline, and the fifth did not contain a minimum number of lots to be

recorded prior to the first takedown.  (Keystone's Answers to Interrogatories 14, 17).

31.     Keystone did not, at any point, represent that it had agreed to extend the recording

deadline under the 60-foot and 70-foot contracts.

32.     Waccamaw filed a verified complaint against Keystone on February 23, 2009, and

asserted claims for breach of contract, fraudulent misrepresentation, and unfair and

deceptive trade practices.  Keystone counterclaimed for return of the escrow money

deposits.  The parties exchanged written discovery, and Keystone deposed Hardy as

Waccamaw's Rule 30(b)(6) representative.[2]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), incorporated by Bankruptcy Rule 7056,

summary judgment is proper "if the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R.

CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986).  The "plain language of Rule

---

[2] The deposition transcript indicates that Hardy was aware that he spoke on behalf of the corporation and that the answers he provided would bind the corporation.

56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." <u>Celotex</u>, 477 U.S. at 322.  In making this determination conflicts are resolved by viewing

all facts and all reasonable inferences in the light most favorable to the nonmoving party.  <u>United</u>

<u>States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

<h2 style="text-align:center">ANALYSIS</h2>

**A. Breach of Contract**

 Waccamaw argues that Keystone committed breach of contract by terminating the

contracts after Seller recorded 61 lots on December 30, 2008, by terminating the contracts

without providing Seller with notice of default and a 30 day cure period, and by failing to

purchase any lots.  Keystone asserts that Seller's failure to record all of the Contract Lots by

December 30, 2008, was a material breach that entitled Keystone to terminate and excused

Keystone's obligation to perform under the contracts.  Keystone further asserts that it properly

provided Seller with notice and opportunity to cure the breach.

1. Was Keystone entitled to enforce the contracts' termination provisions upon Seller's
  failure to record all of the lots required under either contract by December 30, 2008?

 Keystone asserts that the contracts expressly require Seller to record all of the lots to be

purchased under each contract by December 30, 2008, and that Seller's failure to comply with

this condition gives Keystone an absolute right to terminate the contracts.  Waccamaw counters

by arguing that the contracts do not, in fact, require *all* of the lots to be recorded by December

30, 2008.  Referring to numerous provisions within the contracts which indicate that the parties

intended the lots to be recorded and purchased in phases, rather than all at once, and other

9

provisions which use the term "Lots" inconsistently, Waccamaw contends that it is reasonable to interpret the contracts as requiring only a portion of the lots to be recorded by December 30, 2008. Based on the aforementioned inconsistencies, Waccamaw asserts that the contracts are ambiguous and thus extrinsic evidence is necessary to clarify the parties' intentions. Finally, Waccamaw argues that, even if the contracts did require all of the lots to be recorded by December 30, 2008, Keystone was not entitled to terminate because Seller had substantially performed under the contracts or that Seller was entitled to a "reasonable time" after December 30th to complete performance because the contracts lack time is of the essence clauses.

Contrary to Waccamaw's assertions, the court finds that the contracts clearly and unambiguously require Seller to record all 121 lots by December 30, 2008. If the plain language of a contract is clear and unambiguous, the parties' intentions must be inferred exclusively from the terms of the contract as a matter of law. Weaver v. St. Joseph of the Pines, Inc., 652 S.E.2d 701, 709 (N.C. Ct. App. 2007). "Individual clauses in an agreement and particular words must be considered in connection with the rest of the agreement, and all parts of the writing, and every word in it, will, if possible, be given effect." Robbins v. C.W. Myers Trading Post, Inc., 117 S.E.2d 438, 440-41 (N.C. 1960).

Each party's argument rests primarily on the construction of paragraph three of the contracts, which require Keystone to begin taking-down lots according to a set schedule and also provide: " If Seller has not recorded the Contract Lots by December 30, 2008, Purchaser may provide notice to Seller of its intent to terminate the Contract . . . ." Although Waccamaw correctly asserts that the contractual language allows for lots to be recorded and purchased in phases, rather than in one lump group, the conclusion drawn by Waccamaw cannot be reconciled

10

with the clear requirement that Seller must record the Contract Lots by December 30, 2008.

However, if the contracts are construed as intending for the lots to be recorded and purchased in

phases over the two year period between contract execution and the December 30th deadline,

then every provision of the contracts can be given effect.[3]  The court further finds that

inconsistent usage of the term "Lots" does not create ambiguity as to the term "Contract Lots,"

which is consistently used to refer to the whole of the lots.  Because there is no ambiguity as to

whether the contracts require all 121 lots to be recorded by December 30, 2008, extrinsic

evidence is neither necessary nor admissible on this issue.

      The substantiality of Seller's performance is not at issue because the recording deadline

is an express condition, and the contracts specifically provide that breach of that condition is

grounds for termination.  "Express provisions that a contract will come to an end at the option of

one or either of the parties are enforceable."[4]  17B C.J.S. Contracts § 442 (2009); see generally

State Farm Mut. Auto. Ins. Co. v. Atlantic Indem. Co., 468 S.E.2d 570 (N.C. Ct. App. 1996)

(affirming trial court's enforcement of termination clause in insurance policy);  Miller v. Parlor

Furniture of Hickory, Inc., 339 S.E. 2d 804, 805 (N.C. Ct. App. 1986) (enforcing termination

clause in lease agreement).  Where the express provisions of a contract require strict

---

[3]Waccamaw also refers to provisions in paragraph 8 of the contracts to support its assertion that the recording and takedown schedule was to be performed in phases.  The court's interpretation of the contractual terms is congruent with those provisions.

[4]  This rule applies equally to Waccamaw's argument that the contracts do not contain a time is of the essence clause and thus Seller was entitled to a "reasonable time" after the recording deadline to complete performance.  Time is generally not regarded as of the essence in land sale contracts, except when a specific time for performance is set forth in the express terms of the contract.  77 AM. JUR. 2D Vendor and Purchaser § 69 (2010).  Paragraph 3 of the contracts provides a specific time for performance, and thus the court finds no merit in Waccamaw's argument that the recording deadline was not of the essence under the contracts.

performance, the breaching party cannot rely on the doctrine of substantial performance as a basis for recovery.  See Coastal Seafood Company, Inc. v Alcoa South Carolina, Inc., 381 S.E.2d 502, 503 (Ct. App. S.C. 1989) (citing 17A C.J.S. Contracts § 508 (1963)).   In the Rule 30(b)(6) deposition, Waccamaw's corporate representative unequivocally admitted that Seller's failure to record all of the lots by the December 30th deadline triggered Keystone's right to terminate the contracts according to the unmodified contractual terms.[5]  Based on the undisputed facts, the court finds that Seller breached an express condition of the contracts by recording only a portion of the lots on December 30, 2008, and that Keystone was lawfully entitled to enforce the contractual termination clauses upon such breach.

    2.    Did Keystone unlawfully terminate the contracts by failing to provide Seller with notice and opportunity to cure Seller's breach?

Under North Carolina law, breach of contract occurs when a party terminates or repudiates a contract without providing the notice and cure period required by the contract. Dishner Developers, Inc. v. Brown, 549 S.E.2d 904, aff'd, 557 S.E.2d 528 (N.C. Ct. App. 2001). In Dishner, a contract for the sale of land required the purchaser to allow the seller 30 days to cure a title defect after the purchaser provided written notice of the same.  When the purchaser learned that the title was encumbered by outstanding deeds of trust, she indicated that she could not close the deal under those circumstances, and a week later notified her realtor that she declared the contract "null and void" and ordered the realtor to "halt the deal."  Id. at 905.  The

---

[5] "Q: So under your theory of an understanding of the contract, then Keystone would have had the right to terminate the contract since they're not yet recorded.  Is that right?  A: All 121?  Q: Correct.  A: Yes.  Q: So they would have had the right to terminate because those were not all recorded by December 30th of 2008. Correct? A: Correct."  (Deposition 42-43).

court found the purchaser in breach of contract based on her failure to provide the seller with written notice and an opportunity to cure the default before terminating the contract and held that the purchaser's breach relieved the seller's duty to perform.  Id. at 206.

Relying on Dishner, Waccamaw argues that Keystone deprived Seller of proper notice and opportunity to cure the breach, excusing Seller from any obligation to cure its breach. Paragraph 15 of the contracts provides Seller with 30 days to cure any breach after receipt of written notice of the default.  On December 31, 2008, Keystone sent a letter to Seller which specifically identified the inadequacies in Seller's performance and stated "please consider this letter, pursuant to paragraph 3 of the Contracts, as Purchaser's notice of intent to terminate both Contracts . . . ."  Rather than attempt to cure the breach upon receipt of this notice, Seller instead told Keystone it was in default and therefore that Seller was not obligated to cure.

Waccamaw asserts that Keystone did not provide adequate notice because the December 31st letter failed to advise Seller of its right to a 30 day cure period.  Additionally, Waccamaw contends that even if the notice was sufficient, Keystone deprived Seller of the right to cure in violation of the contracts because the December 31st letter and January 7th notice effectively terminated the contracts, excusing Seller from any further duty to perform.  Keystone asserts that the December 31st letter properly notified Seller of the breach as required by the contracts, which was not a repudiation and did not, in any way, hinder Seller's ability to cure the breach within the 30 day cure period.

Based on the record, the court finds that Keystone complied with the contractual default provisions via the written notice of default provided on December 31, 2008, which afforded Seller the opportunity to cure and was not a repudiation of the contracts.  The facts are not

13

analogous to <u>Dishner</u> because written notice was not provided in that case.  Here, Seller received written notice of the default in the December 31st letter as required by paragraph 15.  The contracts do not obligate Keystone to reference the cure provision in the notice, and Waccamaw concedes that it can offer no authority to support its position on this issue.  Furthermore, the record contains an interoffice email from Ezzell to Hardy, sent on December 30, 2008, notifying Hardy of the default provision and cure period.  The record clearly shows that Waccamaw was fully aware of its right to cure the breach when it received such written notice from Keystone but took no action to cure the defective performance.

Moving on to the second prong of Waccamaw's argument, that Keystone terminated the contracts prior to the expiration of the 30 day cure period, the court finds that no such repudiation occurred.  On its face, the forward looking language of the December 31st letter purports to provide notice of Keystone's *intent* to terminate the contracts, rather than notice of termination of the contracts.  The same is true for the January 7th filing.  To contravene the express language of the documents, Waccamaw urges the court to look to Keystone's answers to interrogatories in support of its assertion.  However, Waccamaw relies on the alleged anticipatory repudiation made in the December 31st letter and January 7th notice to justify Seller's failure to take any action to cure the breach within the cure period, arguing that Keystone breached first and thus should be held responsible for the failed performance.  As such, the court finds that it must look first to the documents for evidence of anticipatory repudiation, and given that no such evidence exists, the court will not allow Waccamaw to rely on contradictory indications extracted from answers to interrogatories provided months after the fact.

Based on the undisputed record, the court grants summary judgment in favor of Keystone

14

on Waccamaw's claim for breach of contract.

**B. Fraudulent Misrepresentation**

To prevail on a claim of fraudulent misrepresentation at summary judgment, the record

must show: "(1) false representation or concealment of a material fact, (2) reasonably calculated

to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in

damage to the injured party." Hospira, Inc. v. Alphagary Corp., 671 S.E.2d 7, 11 (N.C. Ct. App.

2009). Upon careful review of the record, the court finds no false representation or concealment

of any material fact to support Waccamaw's claim for fraudulent misrepresentation.

Waccamaw contends that Keystone fraudulently misrepresented its willingness to honor

its contractual obligations and argues the determination of Keystone's intent in making this

misrepresentation is a matter of fact that precludes summary judgment. Abandoning any

argument that Keystone agreed to extend the contractual recording deadline,[6] Waccamaw insists

instead that Keystone had no intention of performing under the contracts, regardless of whether

the Seller was able to comply with its performance obligations.[7] The record contains numerous

statements indicating that Keystone intended to honor its contractual duties despite the debtor's

bankruptcy, and it is these affirmative statements upon which Waccamaw claims to have relied

---

[6] Despite this clear concession, Waccamaw attempts to rely on the prior course of
dealings between Keystone and LandCraft to justify its accusation that Keystone wrongfully
terminated the contracts. The record belies the existence of any consistent course of dealings
between Keystone and LandCraft upon which Waccamaw could have relied in believing that
Seller was not obligated to comply with the recording deadline.

[7] On page 24 of Waccamaw's memorandum of law in opposition to Keystone's motion
for summary judgment, Waccamaw states: "Waccamaw is not claiming that Keystone
misrepresented that it would extend the contractual deadline, but that it misrepresented that it
would honor its obligation to purchase lots if Waccamaw continued funding the project."

in continuing to fund the project.

Waccamaw's fraudulent misrepresentation claim is premised on the assumption that Keystone breached its contractual duties by providing Seller with notice of its intent to terminate the contracts based on Seller's failure to record all of the Contract Lots by the recording deadline.  In the Rule 30(b)(6) deposition, Hardy repeatedly stated that Keystone assured him that "if [Waccamaw] continued forward at that point, that they would honor the contract as such. And they did not indicate to me that their intent was to back out of the contract."  The record clearly shows that, when Waccamaw asked Keystone if it would perform under the contracts, Waccamaw assumed that the debtor would also perform.  In the letter dated September 22, 2008, Waccamaw directly inquired as to Keystone's willingness to perform under the contracts.  The letter explicitly states:

> Of course, this assumes that the debtor is able to comply with its contractual obligations to deliver in accordance with those contracts. . . . If, regardless of whether the debtor meets its obligations under the contracts and delivers the lots in a timely fashion, your client does not intend to meet its contractual obligations, then it would be helpful for us to know that now.  With that in mind, please advise me of your client's intentions.

Keystone's September 24th response conveyed its skepticism as to the debtor's ability to perform and extreme concern about allegations of fraud pertaining to the debtor, followed by a commitment "to meet any enforceable legal and contractual obligations."  Then Keystone qualified this statement with its belief that those obligations may be void or voidable based on the alleged fraud.  Far from evidencing a commitment by Keystone to purchase lots under the contracts regardless of whether the debtor met its obligations, these letters show that Keystone promised to perform only to the extent required by the law and the mutually agreed-upon terms of the contracts.

16

Waccamaw also argues that Keystone's responses were ambiguous to such an extent that the lack of disclosure equates to a misrepresentation of the facts. Citing to the August 22, 2008 email between Hardy and Jones, Waccamaw contends Keystone had a duty to affirmatively state that recording only 61 lots was a violation of the contracts or that Keystone would not perform unless all 121 lots were recorded. The court notes that in August of 2008, Seller would not have been in default of the contracts if only 61 lots were recorded. In fact, if Seller had recorded 61 lots at that time, Keystone would have been obligated to begin purchasing lots according to the takedown schedule. Not only did Waccamaw fail to respond to Keystone's question about the remainder of the lots not included on the plat, which ended the correspondence before Keystone obtained a definitive answer, but the facts do not indicate that Waccamaw was deceived by Keystone's response. In July, Stover told Hardy that without an amendment to the contracts, which Keystone was not willing to grant at that time, failure to complete the lots by the recording deadline could result in Keystone's termination of the contracts. By September Keystone had made it clear to Waccamaw that it would perform only if legally obligated.

The record does not contain even a scintilla of evidence that Waccamaw ever believed, or that Keystone ever represented, that Keystone would perform under the contracts if Seller failed to meet its performance obligations on time. Waccamaw's fraudulent misrepresentation claim could only prevail if Keystone had breached the contracts by exercising its right to terminate upon Seller's failure to record the Contract Lots by December 30, 2008. Based on the court's determination that Keystone was legally entitled to terminate the contracts due to Seller's breach, the court finds that the record is void of any false representation or concealment of a material fact made by Keystone with the intent to deceive, or any representation that, in fact,

17

deceived Waccamaw to its detriment.  Keystone's motion for summary judgment is granted as to Waccamaw's claim for fraudulent misrepresentation.

## C. Unfair and Deceptive Trade Practices

Based on the aforementioned analysis, Keystone's motion for summary judgment on Waccamaw's claim for unfair and deceptive trade practices under North Carolina General Statute § 75-1.1 is granted.  To withstand summary judgment on a claim for unfair and deceptive trade practices, the record must show evidence of: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff.  See N.C.G.S. § 75-1.1 (2009).  The record shows no evidence of any unfair or deceptive act or practice by Keystone which harmed Waccamaw.

Under N.C.G.S. § 75-16.1 attorney's fees are available to the prevailing party upon a finding that the party instituting the action knew, or should have known, that the action was frivolous and malicious.  The record shows that Waccamaw's fraud claim was not grounded in any factual or legal basis, but rather that it was based on the erroneous assertion that Keystone had somehow breached the contracts.  In its verified complaint, Waccamaw admitted that only 61 lots were recorded, but stated that Keystone breached by terminating the contracts after Seller had fulfilled all conditions precedent to Keystone's obligation to purchase.  Then in the 30(b)(6) deposition, Waccamaw initially asserted that all 121 lots had been recorded, such that Seller was in compliance with the contracts, and admitted that Keystone had a right to terminate if Seller failed to record all 121 lots.  Hardy's testimony completely contradicts the factual allegations in Waccamaw's verified complaint.  It is clear from the record that Waccamaw knew, or should have known, that Keystone had complied with its contractual obligations in accordance with the

18

representations made to Waccamaw.

Given that the record contains absolutely no indication that Keystone ever represented or implied that it would perform under the contracts in the face of Seller's breach, the court finds that Waccamaw should have known that the action was frivolous and malicious. Waccamaw's argument simply does not follow from any reasonable construction of the facts or the law. Keystone is awarded its reasonable attorney's fees according to the affidavit of John R. Buric submitted to the court on February 25, 2010.

**D. Recovery of Earnest Money Deposits**

Under paragraph 15 of the contracts, Seller is obligated to return the earnest money deposits to Keystone if Seller fails to perform. Keystone asserts that as assignee of Seller, Waccamaw is obligated on any claims arising from the original agreement, including the obligation to refund the earnest money. Arguing that the collateral assignment expressly limits its liability under the contracts, Waccamaw contends that the obligation to refund the earnest money was not assumed and moves for summary judgment on Keystone's counterclaim.

North Carolina has adopted the Restatement rule pertaining to the effect of acceptance of an assignment:

> (1) Where a party to a bilateral contract which is at the time wholly or partially executory on both sides, purports to assign the whole contract, his action is interpreted, *in the absence of circumstances showing a contrary intention*, as an assignment of the assignor's rights under the contract and a delegation of the performance of the assignor's duties.
> (2) Acceptance by the assignee of such an assignment is interpreted, *in the absence of circumstances showing a contrary intention*, as both an assent to become an assignee of the assignor's rights and as a Promise to the assignor to assume the performance of the assignor's duties.

Rose v. Vulcan Materials Co., 194 S.E.2d 521, 533 (N.C. 1973) (quoting RESTATEMENT (FIRST)

19

OF CONTRACTS § 164 (1932)).  Under Rose, a promise to assume both the benefits and the

obligations of a contract is implied upon assumption, absent circumstances that show a contrary

intention.  Applying this standard, the court looks to the record for circumstances showing that

Waccamaw did not intend to assume, or that the debtor did not intend to assign, the debtor's

obligations under the contracts.  The collateral assignment includes a provision that limits

Waccamaw's liability in the event of the debtor's default and Waccamaw's assumption of the

contracts.  Paragraph 10 of the bilateral contracts, titled "Lender Not Obligated," specifically

provides that:

> Nothing contained herein or elsewhere shall operate to obligate, or be construed to
> obligate, lender to perform any of the terms, covenants or conditions contained in the
> Assigned Contracts and Permits or otherwise to impose any obligation upon Lender with
> respect to the Assigned Contracts and Permits or other collateral prior to *written notice*
> *by Lender to Assignor and to the applicable contracting party of Lender's election to*
> *assume Assignor's obligations* under one or more of the Assigned Contracts . . . .  At all
> times *Assignor retains the obligation to reimburse Lender* promptly upon demand or
> other to pay when due *all obligations and liabilities incurred by Lender in connection*
> *with the Assigned Contracts . . . .*

According to the express terms of the collateral assignment, Waccamaw could not become

obligated under an assigned contract without providing written notice to both the debtor and the

other contracting party of its election to assume the debtor's obligations under the contract.

Keystone argues that Waccamaw's use of the term "assignee" in the verified complaint and in a

letter to Keystone's counsel constitutes such written notice.  However, upon careful review of

the record, the court finds no evidence that written notice was provided to Keystone specifying

Waccamaw's election to assume the debtor's obligations under either contract.  Furthermore, by

requiring Eagle Creek to reimburse Waccamaw for any obligations incurred by Waccamaw, the

language of the collateral assignment shows Eagle Creek's intention to retain its obligations

under the contracts.  Because the contractual language is clear and unambiguous, the parties' intentions must be inferred exclusively from the terms of the contracts as a matter of law.  <u>See Weaver v. Saint Joseph of the Pines, Inc.</u>, 652 S.E.2d 701, 709 (N.C. Ct. App. 2007).    Based on the record, the court grants Waccamaw's motion for partial summary judgment.

<u>**CONCLUSION**</u>

Based on the foregoing, Keystone's motion for summary judgment is granted on Waccamaw's claims for breach of contract, fraudulent misrepresentation, and unfair and deceptive trade practices.  Waccamaw's motion for partial summary judgment on Keystone's counterclaim for return of the escrow deposits is also granted.  It is hereby ordered that Waccamaw pay Keystone's reasonable attorney's fees under N.C.G.S. § 75-16.1, according to the affidavit of John R. Buric filed with the court on February 25, 2010.

**"END OF DOCUMENT"**